## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-725 (RDM)** |
| **v.** | : | |
| | : | |
| **KENNETH DUNCAN MASSIE,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Kenneth Duncan Massie to 14 days incarceration, a three-year term of probation, 60 hours of community service, and $500 in restitution.

### I.      Introduction

Defendant Kenneth Duncan Massie, a fifty-two year old maintenance supervisor, participated in the January 6, 2021 attack on the United States Capitol— a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.8 million in losses.[1]

Massie pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained herein, a sentence of 14 days incarceration is

---

[1] Although the Statement of Offense in this matter, filed on October 21, 2022, (ECF No. 66 at ¶ 6) reflects a sum of more than $1.4 million for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

appropriate in this case because: (1) Massie saw that the Capitol had been breached, and saw that the scaffolding and stairs on the West Front had been overrun by rioters, but nonetheless joined a mob of hundreds who were lining up to enter the Capitol building; (2) he entered the Capitol building through the Senate Wing Door approximately seven minutes after the Senate Wing Door was first breached, making him aware of the potential for violence and property destruction; and (3) he looked into a Congressional office and saw an overturned table, and, (4) nevertheless, proceeded to the Crypt, where he unlawfully protested while police were trying to stem the tide of invading rioters present at that location. He left the Capitol approximately 13 minutes after he had entered it.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, Massie's participation in a riot that succeeded in halting the Congressional certification renders a sentence of 14 days' incarceration both necessary and appropriate. Furthermore, the aggravating factors above explain why probation only is not warranted in this case.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 66 (Statement of Offense), at ¶¶ 1-7.

### Massie's Role in the January 6, 2021 Attack on the Capitol

On or about January 6, 2021, Massie traveled with co-defendant Luke Faulkner ("Faulkner") from Ohio to Washington, D.C. to attend the "Stop the Steal" rally. Once in

Washington, Massie and Faulkner joined with co-defendant Jared Kastner ("Kastner") to attend the rally. After the rally, Massie walked to the Capitol building. Faulkner and Kastner also walked to the Capitol, but the three men became separated from one another at some point.



*Still from Exhibit 1 – Massie (green) in Washington, D.C. on January 6*

At approximately 2:00 p.m., rioters forced their way onto the restricted grounds of the U.S. Capitol. *Id.* at 5. Rioters made their way up the west side of the Capitol grounds to the Senate Wing Door. There, rioters smashed glass windows and kicked at the Senate Wing Door from the outside in an attempt to gain entry to Capitol building. At approximately 2:13 p.m., the Capitol building was first breached by a rioter who jumped through a broken window adjacent to the Senate Wing Door.



*Still from Exhibit 2 – First rioter enters Capitol building*

Less than one minute later, rioters who had entered through the broken windows kicked open the Senate Wing Door from the inside. Many rioters who had amassed outside the Senate Wing Door then entered the Capitol building.



*Still from Exhibit 2 – Rioters kick open Senate Wing Door*

4

As shown above in a still from Exhibit 1 and below in a still from Exhibit 2, at approximately 2:19 p.m., Massie joined a group of rioters lining up to enter the Capitol building at the Senate Wing Door.



*Still from Exhibit 2 – Massie (green) approaching the breached Senate Wing Door*

At 2:20 p.m., approximately seven minutes after above-described breach, Massie entered the U.S. Capitol building through the Senate Wing Door, as alarms sounded. Massie joined other rioters who were already unlawfully inside the building. As shown in Exhibits 1, 2, and 3, Massie was wearing a white cowboy hat with lettering, "TEAM TRUMP," a black jacket, and blue jeans when he entered.



*Still from Exhibit 1 – Massie (green) enters the Capitol building*



*Still from Exhibit 3 – Massie (green) enters the Capitol building*

When Massie entered, as shown in Exhibits 1 and 3, rioters were moving throughout the

lobby of the Senate Wing Door area. Massie turned to his right and walked with other rioters past

broken furniture and broken glass on the floor from the smashed-in windows. Massie is shown in Exhibit 3 using his cellphone to photograph his entry into the Capitol building.



*Still from Exhibit 3 – Massie (green) photographing the interior of the Capitol building*

As he traveled towards the House of Representatives side of the Capitol building, Massie briefly looked inside the open door of a Congressional office and then returned to the hallway leading to the Crypt, as shown in Exhibit 1.



*Still from Exhibit 1 – Massie (green) in the doorway of a Congressional office*

In the hallway, Massie was reunited with Faulkner and Kastner, as shown in Exhibit 4.

Massie was greeted by Faulkner with a high-five and a pat on the head, and by Kastner with a hug.



*Still from Exhibit 4 – Faulkner (red), Massie (green), and Kastner (yellow) in the Crypt*

Massie, Faulkner, and Kastner then traveled further into the Capitol building to the Crypt, as shown in Exhibit 5.



*Still from Exhibit 5 – Massie (green), Kastner (yellow), and Faulkner (red) in the Crypt*

At approximately 2:22 p.m., Faulkner appears to have his hand on Kastner's shoulder, and Kastner appears to have his hand on Massie's shoulder, while the group moved through the Crypt, as shown in Exhibit 5.



*Still from Exhibit 5 – Massie (green), Kastner (yellow), and Faulkner (red) in the Crypt*

At approximately 2:25 p.m., a group of rioters in the Crypt pushed towards and through a line of police officers who were attempting to hold back the crowd, as shown in Exhibit 6.

After remaining in the Crypt for approximately ten minutes, Massie, Faulkner and Kastner returned by the route that they had entered. At approximately 2:33 p.m., Massie exited the Capitol building through a broken window adjacent to the Senate Wing Door, as shown in Exhibit 7. Massie was inside the Capitol building for approximately 13 minutes.



*Still from Exhibit 7 – Massie without cowboy hat (green) and Kastner (yellow) exiting the Capitol building*

The government does not have evidence that Massie personally engaged in any destructive or violent activity while inside the U.S. Capitol building.

*Massie's Interview*

On December 9, 2021, following the arrests of Faulkner and Kastner on December 8, 2021, Massie agreed to be interviewed by FBI agents. Massie advised that he travelled to Washington, D.C. on January 6, 2021. Faulkner drove his vehicle from Ohio, transporting Massie and one other individual. Once they arrived in Washington, D.C., Massie attended the "Stop the Steal" rally, which Massie characterized as peaceful. Massie then marched to the U.S. Capitol and was separated from his group during the journey. Massie advised that he was wearing a Trump cowboy hat that he found while in Washington, D.C.

Massie claimed that when he arrived at the Capitol grounds, police lines had already been penetrated and the Capitol building breached. Massie observed scaffolding on the West Plaza and the Northwest Staircase was clear to the Upper West Plaza. Massie ventured further into the Capitol grounds and joined a line of rioters waiting to enter the Capitol building at the Senate Wing Door. Massie estimated 300 to 400 people were in the line. Massie joined the line and waited approximately 15 minutes to enter the Capitol building.

Massie advised agents that he took photographs on his cellphone as he entered the Capitol building, but later deleted them.[2] Massie advised that, once inside, he traveled further into the Capitol building. Massie admitted that he looked into a Congressional office but did not go inside. Massie said he saw that a table had been turned over in the office.

Massie confirmed that he was then reunited with Faulkner and Kastner. The group traveled to the Crypt, where Massie observed police officers holding a line against rioters who were pushing and shoving. Massie advised that he spoke with a police officer in the Crypt and asked the officer how law enforcement planned to deal with the crowd. During that time, Massie claimed he was caught in the crowd pushing forward and he observed other rioters being crushed by the crowd. As result, Massie stated he was scared and he told the others in his group that he wanted to leave.

Massie, Faulkner, and Kastner made their way out of the Crypt and exited the Capitol building through a broken window adjacent to the Senate Wing Door. Massie estimated that he was inside the Capitol building for 10 minutes.

---

[2]  Agents searched Massie's phone and confirmed that there were no photos. They also determined that Massie had no social media presence.

Massie informed agents that once outside, his group agreed that entering the Capitol building had been wrong, it was not why they had travelled to Washington, D.C., and it was going to get worse. At approximately 4:30 p.m., Massie rode back to Ohio with Faulkner.

In sum, Massie accepted responsibility for his actions and admitted that he entered the U.S. Capitol building on January 6, 2021.

<em>The Charges and Plea Agreement</em>

On January 27, 2022, Massie was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On February 8, 2022, Massie was arrested in Ohio. On February 9, 2022, Kastner, Faulkner, and Massie were charged in a four-count Superseding Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On October 21, 2022, Massie pleaded guilty to Count Four of the Superseding Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in the Capitol Building. Under the plea agreement, Massie agreed to pay $500 in restitution to the Department of the Treasury.[3]

### III.   Statutory Penalties

Massie now faces sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement, he faces up to six months of imprisonment and a fine of up to $5,000.[4] He must also pay $500 in restitution under the terms of the plea agreement. *See* 18 U.S.C. § 3663(a)(3);

---

[3]   On October 13, 2021, Faulkner likewise pled guilty to one count of violating 40 U.S.C § 5104(e)(2)(G). Faulkner will be sentenced on January 20, 2022, one week before Massie's scheduled sentencing hearing. Kastner is awaiting trial before a magistrate.

[4] Because Massie has pleaded guilty to a petty offense, a term of supervised release is not authorized. *See* 18 U.S.C. § 3583(b)(3).

*United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.  Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of the recommended sentence of 14 days incarceration, three years' probation, and 60 hours of community service.

### A.  The Nature and Circumstances of the Offense

"The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Massie's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Massie, the absence of violent or destructive acts is not a mitigating factor. Had Massie engaged in such conduct, he would have faced additional criminal charges.

Massie arrived on the grounds of the U.S. Capitol and entered the Capitol building at approximately 2:20 p.m. In order gain entry to the Capitol at that time, he would have crossed over broken down barricades and passed by bike racks that were intended to prohibit entry into the restricted area of the Capitol's grounds, but which had been pushed aside. Massie informed agents that, prior to entering the Capitol building, he observed scaffolding and the staircase leading to the Upper West Terrace. On the West Front of the Capitol at that time, Massie would have witnessed individuals climbing on scaffolding and on the media tower and he would have seen individuals confronting police officers. It would have been clear to Massie that police lines had been penetrated and that rioters had caused property damage. Despite these circumstances, Massie joined a crowd that advanced toward the Capitol building and joined a line that he claimed contained between 300 and 400 rioters. With the crowd, Massie made entry through a non-public entrance at the Senate Wing Door approximately seven minutes after the Capitol was first breached. Thus, he took advantage of the opportunity presented by the mob, ignored the violence and property damage taking place, and unlawfully entered the Capitol building.

While inside the Capitol and over the course of approximately 13 minutes, Massie continued to protest, despite observing rioters breaking glass and hearing alarms blaring throughout the building. Massie looked into a Congressional office, noting that a table had been turned over. Despite witnessing even more evidence of property damage, Massie continued deeper into the Capitol to the Crypt. There, he saw rioters pushing against police who were trying to prevent the rioters' further intrusion into the Capitol. Eventually, Massie departed along with other rioters who police officers were ordering and/or forcing to exit the building. Under all of these circumstances, Massie knew that he was not permitted to be inside the Capitol building, but he entered it and remained inside anyway.

15

Therefore, the nature and circumstances of the offense supports the recommended sentence of 14 days incarceration.

### B.       The History and Characteristics of the Defendant

As set forth in the PSR, Massie is fifty-two years old and is a life-long resident of Ohio. PSR ¶ 36. Massie served in the U.S. Army from 1992 to 1993, and he was honorably discharged. PSR ¶ 49. From 2011 until March 2020, Massie worked as a production supervisor at IntelliGrade located in London, Ohio. PSR ¶ 47. Since March 2020, Massie has worked as a maintenance supervisor at Siliflex in Springfield, Ohio. PSR ¶ 48.

Following his arrest for the charges in this case, Massie expressed remorse for his criminal conduct, in that, during an interview, Massie told FBI agents that once he and his group exited the Capitol, they agreed that entering the Capitol had been wrong. Massie has also expressed a desire to plead guilty, acknowledge his conduct, and promptly resolve his case. When recommending an appropriate sentence, the government gives significant weight to the defendant's early acceptance of responsibility.

### C.       The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

**D.      The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to

convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Massie's conduct on January 6 demonstrates the need for specific deterrence. Massie ignored the violence taking place on the grounds of the Capitol between rioters and police officers, and he chose to join the mob that stormed into the Capitol building. Apparently unconcerned once he entered, he ventured further into the Capitol building to the Crypt. Massie was no mere tourist, and these were not normal visiting hours or circumstances. He was only able to gain entry to the Capitol building because of the riot and he stayed inside the building for approximately 13 minutes. Although his actions at the Capitol on January 6 were more limited than many others', his actions contributed to the danger and violence of that day by increasing the size of the crowd inside restricted areas and the Capitol itself.

Unlike some other January 6 defendants, Massie has accepted responsibility for his actions and indicated his remorse. Thus, his conduct suggests a lesser need for specific deterrence than in some other cases. A period of 14 days' incarceration, 36 months of probation, and 60 hours of community service will adequately serve that purpose.

### E.    The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[5]

---

[5] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

This Court must sentence Massie based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Massie has pleaded guilty to Count 4 of the Superseding Information, charging him with Parading, Demonstrating, or Picketing in the Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.   § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced

sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the

Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his

exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case. The instant case bears some similarity to *United States v. Richard Watrous*, 1:21-CR-00627. There, Chief Judge Howell imposed 14 days of intermittent confinement as a condition of 36 months' probation, two months of home confinement, where the defendant, among other things, took a photo of a damaged window by the Upper House Door but then still entered the Capitol building and stayed for five minutes, and watched as a man went stole wine reportedly from Speaker of the House Nancy Pelosi's office, and the defendant reentered the Capitol building again later despite seeing those things that should have given him misgivings.

In *United States v. Leticia Ferreira*, 1:22-cr-00210, Judge Chutkan imposed a sentence of 14 days incarceration and 36 months' probation. There, the defendant entered the Capitol building two minutes after it was initially breached, after seeing tear gas deployed into an angry crowd of rioters gathered near the Inaugural stage, and she remained inside for 45 minutes. The defendant went to the Crypt and was part of a group of rioters who forced their way through a line of police officers who were attempting to stop the advance of the crowd through the Capitol building.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize

and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

V.    **Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Massie to 14 days incarceration, 36 months of probation, 60 hours of community service, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW GRAVES
UNITED STATES ATTORNEY

By:    s/ *Will N. Widman*
       WILL N. WIDMAN
       Trial Attorney, Detailee

**CERTIFICATE OF SERVICE**

On this 18th day of January, 2023, a copy of the foregoing was served upon all parties

listed on the Electronic Case Filing (ECF) System.


By:      s/ *Will N. Widman*
         WILL N. WIDMAN
         Trial Attorney, Detailee